Samuel J. Silverman, J.
Proceeding to regulate the custody, education, support, etc., of an infant.
I. The major issue arises on the father’s request that the child be brought up in the Roman Catholic religion — specifically, that she either attend a Roman Catholic parochial school or attend a Roman Catholic institution on a released-time program.
Petitioner, the father, is a Roman Catholic. Respondent mother is Jewish.
The parties were married in New York in April, 1954, in a Roman Catholic Church ceremony. In connection with and as a prerequisite to that marriage, the parties executed the standard form written undertaking of the New York Archdiocese that any children of the marriage would be raised in the Roman Catholic religion. Thereafter, they moved to England where they lived for some years. Their daughter, Leslie, was born in England in June, 1957. In the early months of 1962, the parties separated. In November, 1962, a decree nisi for divorce was granted to the wife in the English High Court of Justice, on the ground of the husband’s adultery and cruelty. The decree became final on May 10, 1963. The action was uncontested. The wife was granted custody of the infant, presumably without objection from the husband. In December, 1962, pursuant to permission granted by the English court, the wife returned to the United States with the infant. Thereafter in the Spring of 1964, the husband also returned to the United States and all parties now reside in New York State. The husband has remarried out of the Roman Catholic Church, a marriage in the Roman Catholic Church being impossible in view of his previous marriage. The wife has recently remarried, her husband being Jewish; and she and her husband observe the Jewish religion. The child, at least since her return to this country, has been affiliated with the Jewish religion and her mother has taken her to children’s services at a Reform Jewish temple.
*3 For a good deal of the period that they were married to each other, the relationship between petitioner and respondent appears to have been a stormy one; and an important subject of dispute appears to have been related to their religious differences.
In 1955 the parties were apparently informally separated for a period. In about April, 1955, they were reconciled. In connection with that reconciliation, there was discussion of the religion in which any possible offspring of the marriage might be raised, the husband wanting any child to be raised as a Roman Catholic, the wife objecting to this and suggesting some other religion, e.g., Unitarianism. The dispute was never resolved.
About two years later, in June, 1957, the child was born.
It appears to the court that, from a religious standpoint, the home of the parties and the upbringing of the child while the parties were living together may best be described as nondenominational with points of contact with Roman Catholicism, Protestantism and Judaism.
The child was baptized in the Roman Catholic Church about a month after her birth. At Christmas and Chanukah time there would be a Christmas tree at home and there would also be Chanukah lights. ’ It seems fair to say that neither Christmas nor Chanukah was treated as particularly denominational religious observances in the home of the parties. Both the husband’s and the wife’s religious observances appear to have been extremely irregular and infrequent while they were living together, though the husband has at all times considered himself a Catholic and the wife has at all times considered herself to be Jewish. The husband did attempt to teach the child to make the sign of the cross, and to give the child a little training in the Roman Catholic religion, but it does not appear that it can fairly be said that the child was really being brought up in any particular religion. When it came time for her to attend school, she was sent, with the approval of both parents, to a school affiliated with the Church of England.
After the parties separated, and for the few months before the Avife returned to the United States, the husband did, on the occasions when he had the child on Sundays, attend Mass Avith the child Avith fair regularity. But this Avas after the parties had separated and were being divorced.
After the wife and child returned to the United States, the husband’s contacts with the child, even after his return to the United States, were rather infrequent.
At least, since December, 1962, the wife has maintained a JeAvish home, has been affiliated with a Jewish temple, has raised *4 the child as Jewish, and the wife and child have attended Jewish religious services. The child attended a Jewish Summer camp for children in the Summers of 1963 and 1964.
The court, with the consent of both parties, interviewed the child. The child appeared to the court to be a very bright, attractive, perfectly normal child, aware of the fact that her father is Catholic and her mother Jewish and aware of the existing conflict. The child expressed a preference for being brought up in the Jewish faith and stated that she considered herself Jewish. She is, of course, only 7% years old.
In the court’s view, the problem is not determined by considerations of the law of contract, with related considerations of modification, waiver, abandonment, estoppel, etc. Bather, the determinative consideration must be the welfare of the child.
Obviously, this child could live happily in any religion if her parents were in genuine harmony about bringing her up in that religion. And equally obviously in that event the matter would not be before the court.
It appears to the court that the court should not interfere with the mother’s discretion as to the child’s religious training. There is no valid basis for taking this child from her mother and giving custody to the father at this stage of the child’s life. As the mother has and will have custody of the child, it would lead to great conflict and probable injury to the child’s psychological well-being to attempt to compel the mother to raise the child against the mother’s will in a religion that is different from the religion of the mother’s home and that would represent for the child a sharp compulsory break from the religion with which she now feels herself to be affiliated and which she knows is the religion in which her mother wishes to raise her.
The father is now divorced from the mother and remarried. He has for several years not lived with, or even seen much of, his former wife or his child. In these circumstances, to grant the order the husband asks for would be to give him more control over the child’s religious upbringing and education than he apparently had or exercised when the parties were living together.
Finally, there would seem to be some problem about the enforcibility of such an order as petitioner asks, and whether efforts to enforce such an order might not do more harm than good.
Accordingly, the application fpr an order requiring the wife to have the child attend a Roman Catholic parochial school or to attend a Roman Catholic released-time program is denied.
*5 Both parties appear to the court to be honorable and high-minded people, concerned with their child’s welfare. It is to be hoped that they will co-operate to the end that the religious differences between them will not hurt the child. The child is not responsible for that difference.
Nothing herein is intended to suggest that any effort should be made to conceal from the child the fact that she is a product of a mixed marriage; that she has a Roman Catholic father and a Jewish mother; that she has a Roman Catholic grandmother and a Jewish grandmother; and that she is equally related to both sides of her family and owes them equal love and respect.
II. The father shall have the right of visitation one week end per month, and one week-end day per month, except when the child is away at camp. The parties may, on the settlement of the order, submit suggestions to implement this visitation provision.
With respect to visitation, obviously no .statements should be made to or in the presence of the child derogatory of either parent. The husband voluntarily undertook in court to see to it that no such statements would be made by anyone on his side of the family during any visitation; and the court Avas impressed with the sincerity of that undertaking.
III. As to the amount to be paid by the father for the support of the child, it is quite apparent that the child’s standard of living Avill be determined primarily by the standard of living of the home of the child’s mother and her new husband. The father’s support payments will be a contribution toward the additional expense of the household due to the presence of the child. The amount of that contribution should presumably not be determined by the standard of living that the mother and her neAV husband are able to establish for their home. The father’s salary is $15,000 per year; his “ net ” income is about $950 per month. He is remarried: there are at present no children of the father’s second marriage. In all the circumstances the father is directed to pay to the wife $135 per month for the support of the child, commencing as of November 15, 1964, and crediting against such obligation any payments made since November 15, 1964.
IV. The application for an injunction to restrain removal of the child from the State of New York or County of Noav York is denied, as it appears that there is no present likelihood of any such permanent removal.